UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------
MAGUENA REIMERS-FINCHER,

                            Plaintiff,                       **MEMORANDUM AND ORDER**
                                                      **08-CV-2397(DRH)(GRB)**

      -against-

NASSAU HEALTH CARE CORPORATION,
and GARY BIE, in his official and individual
capacity,

                            Defendants.


-----------------------------------------------------------X

**APPEARANCES:**


**For the Plaintiff:**
**LAW OFFICES OF FREDERICK K. BREWINGTON**
556 Peninsula Blvd.
Hempstead, New York 11550
By:    Frederick K. Brewington, Esq.

**For the Defendants:**
**CLIFTON BUDD & DEMARIA, LLP**
420 Lexington Avenue
New York, New York 10170
By:    Sheryl Ann Orwel, Esq.

**VENABLE LLP**
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
By:    Brian J. Clark, Esq.

**Hurley, Senior District Judge:**

Plaintiff Maguena Reimers-Fincher ("plaintiff") commenced this action against defendants Nassau Health Care Corporation ("NHCC") and Gary Bie ("Bie") (collectively, "defendants") asserting claims of race-based discrimination and retaliatory employment practices in violation of 42 U.S.C. § 2000(e) (Title VII), 42 U.S.C. § 12101 (The Americans with Disabilities Act ("ADA")), 42 U.S.C § 1981, 42 U.S.C. § 1983, and New York's Human Rights Law, Executive Law § 296.  Presently before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56").  For the reasons set forth below, the defendants' motion is granted.

## Background

The following facts, drawn from the parties' Local Rule 56.1 statements, the pleadings, and prior decisions in this case, are undisputed unless otherwise noted.

### Procedural History

In an Order dated June 13, 2008, this Court, adopting Magistrate Judge Orenstein's Report and Recommendation in its entirety, granted defendants' motion pursuant to Federal Rule of Civil Procedure 21 to sever into separate actions the claims of seven plaintiffs, including Reimers-Fincher, each of whom claimed that defendants had discriminated against him or her on the basis of race.  (*See* 06-CV-4757, Docket No. 64 (Memorandum and Order, dated June 13, 2008)).  In the same opinion, the Court also dismissed plaintiffs' Title VI claims in their entirety and their Title VII claims against all of the individual defendants.  (*Id*. at 14-15.)  In addition, the Court dismissed Reimers-Fincher's ADA claim against the individual defendants.  (*Id*. at 3.)

### Plaintiff's Employment Responsibilities at NHCC

Plaintiff, an African American, began working for NHCC in 1989.  (Defs.' R. 56.1 Stmt. ¶

4.)  "NHCC is a Public Benefit Corporation created by the New York State Legislature" authorized to operate Nassau County Medical Center.  (*Id.* ¶ 1.)  NHCC's duties extend beyond operation of the Hospital as it also "operates an infirmary and medical housing unit located at the Nassau County Correctional Center (the "Correctional Center")."  (*Id.*)

"Plaintiff was the Medical Records Director at the Hospital," although plaintiff points out that her proper title was "Director of Medical Records Systems and Admissions Management." (Defs.' R. 56.1 Stmt. ¶ 5; Pl.'s R. 56.1 Stmt. ¶ 5.)  According to plaintiff, "[s]he was responsible for medical records and admissions, and supervised approximately 82 employees in the medical records department, and approximately 45-50 employees in the admitting office."  (Pl.'s R. 56.1 Counterstmt. ¶ 2.)  "As Medical Records Director working within the finance division," plaintiff reported directly to NHCC's Vice President of Finance, Richard Perrotti.  (Defs.' R. 56.1 Stmt. ¶ 7.)  Plaintiff did not report directly to Gary Bie, the Chief Financial officer of NHCC who oversaw NHCC's financial matters and was responsible for "supervising general accounting, financial, medical records, patient access, revenue cycle, payroll, general ledger and accounts payable." (*Id.* ¶¶ 2, 3, 7.)

### Problems at the Correctional Center

"By letter dated March 26, 2002, the New York State Commission of Correction advised NHCC that there were serious deficiencies in [its] operation of the Correctional Center Infirmary, including NHCC's handling of medical records for patient-inmates."  (Defs.' R. 56.1 Stmt. ¶ 11.) According to defendants, the "charts were below generally accepted standards for medical recordkeeping."  (*Id.*)  To remedy this deficiency, "the State Commission of Correction required NHCC to establish and maintain within the Correctional Center an individualized health center medical record for every inmate."  (*Id.*)

NHCC took immediate action by establishing a Medical Records Department at the Correctional Center.  (Defs.' R. 56.1 Stmt. ¶ 12; Perrotti Aff. ¶¶ 8-9.)  "A Medical Records Supervisor and a Medical Records staff were permanently assigned to the Correctional Center under the supervisory guidance of Angela Youmans."  (Defs.' R. 56.1 Stmt. ¶ 13.)  "Plaintiff [does not dispute that she] was actively involved in the establishment of the Medical Records Department at the Correctional Center," and that "once it was established she remained as the Medical Records Director at the Hospital."  (*Id.* ¶ 14.)  Plaintiff disputes, however, that as part of her involvement she worked part time at the Correctional Center.  (Pl.'s R. 56.1 Stmt. ¶ 12.)

Despite its efforts, in February of 2003, Nassau County officials advised NHCC "that it was in serious danger of losing its contract with the County to provide health services at the Correctional Center unless it improved dramatically its performance under the contract."  (Defs.' R. 56.1 Stmt. ¶ 16; Perrotti Aff. ¶ 12.)  According to NHCC, "[t]his was a great concern to NHCC since the contract with the County to provide health services at the Correctional Center represented approximately twenty million ($20,000,000) dollars in annual revenue for NHCC." (Defs.' R. 56.1 Stmt. ¶ 15.)

*NHCC Reassigns Plaintiff to the Correctional Center*

On or about February 26, 2003, Bie and Perrotti met with plaintiff to discuss her reassignment to the Correctional Center.  (Defs.' R. 56.1 Stmt. ¶ 26; Pl.'s R. 56.1 Counterstmt. ¶ 9.)  At that meeting, Bie and Perrotti informed plaintiff of the problems NHCC was having at the Correctional Center, in particular, that the charts were terrible.  (Defs.' R. 56.1 Stmt. ¶¶ 29-30.) They also told plaintiff "that if NHCC lost the County contract millions of dollars in revenue would be lost."  (Defs.' R. 56.1 Stmt. ¶ 32; Reimers-Fincher Dep. at 63.)  Although defendants claim that Bie and Perrotti told plaintiff that her reassignment was temporary, plaintiff claims

that she was never told whether her transfer was permanent or temporary.  (Defs.' R. 56.1 Stmt. ¶ 19; Pl.'s R. 56.1 Counterstmt. ¶ 16.)

The reasons for plaintiff's transfer are disputed.  According to the defendants, NHCC reassigned plaintiff to the Correctional Center to address the County's concerns with respect to medical records and it chose to send plaintiff, the most experienced medical records professional, in order to demonstrate to the County that NHCC took their concerns seriously.  (Defs.' R. 56.1 Stmt. ¶¶ 19, 22.)  Plaintiff, however, contends that she was reassigned to address problems with utilization review, a process that involves calling a patient's insurance company to find out how many days the insurance company will cover that person in the hospital.  (Pl.'s R. 56.1 Stmt. ¶ 19; Reimers-Fincher Dep. at 90-91.)  Plaintiff claims that she had no experience in utilization review.  (Pl.'s R. 56.1 Stmt. ¶ 19.)

*Plaintiff's Ankle Injury*

Plaintiff injured her ankle while working on February 21, 2003, but did not see a doctor until after her meeting with Perrotti and Bie on February 26, 2003.  (Defs.' R. 56.1 Stmt. ¶ 46; Reimers-Fincher Dep. at 66-67.)  At the time of the meeting with Perrotti and Bie, plaintiff "was not wearing any type of visible brace or cast," but plaintiff insists that she walked using her father's cane.  (Pl.'s R. 56.1 Stmt. ¶ 44.)  Plaintiff testified that "she did not recall telling Defendant Perrotti[1] or Bie anything about her injury during the meeting," but contends that defendants "were made aware of [her] injury because she called Defendant Perrotti's secretary and reported the accident" when it occurred on February 21, 2003.  (*Id.* ¶ 45; Reimers-Fincher Dep. at 65.)  Plaintiff does not dispute that "it was not until an MRI was done in April, more than

---

[1] Although plaintiff often refers to Perrotti as a defendant he was not a named defendant in plaintiff's Second Amended Complaint filed on October 20, 2008.

a month after the meeting with Bie and Perrotti, that a fracture was found." (Defs.' R. 56.1 Stmt. ¶ 47.)

*Plaintiff's Working Conditions at the Correctional Center*

According to defendants, "Plaintiff shared desk space with other medical records employees at the Correctional Center," but plaintiff complains that at times when "everybody was present" in the department she had no place to sit. (Defs.' R. 56.1 Stmt. ¶ 52; Pl.'s R. 56.1 Stmt. ¶ 52; Reimers-Fincher Dep. at 95-96.) In addition, plaintiff complains that she did not receive an identification badge that would have allowed her to move freely about the Correctional Center and "properly perform her duties." (Defs.' R. 56.1 Stmt. ¶ 60; Pl.'s R. 56.1 Stmt. ¶ 60.) Plaintiff, however, attributes the delay in getting a badge to Gary Bie's inexperience as the Chief Financial Officer of the Hospital. (Defs.' R. 56.1 Stmt. ¶ 62; Reimers-Fincher Dep. at 144.)

Plaintiff alleges that Robert Spina, an administrator assigned to the Correctional Center, was given his own office and a badge. (Defs.' R. 56.1 Stmt. ¶¶ 54, 66.) Plaintiff, however, admits that unlike herself Mr. Spina was in charge of all health services at the Correctional Center. (*Id*.)

*Plaintiff Voluntarily Retires*

On April 8, 2003, plaintiff wrote to Dr. Neil, the Medical Director at the Correctional Center, advising him that she was retiring effective July 7, 2003. (Defs.' R. 56.1 Stmt. ¶¶ 17, 68.) Plaintiff was never asked to retire. (Defs.' R. 56.1 Stmt. ¶ 69.) Plaintiff does not dispute that she worked only until May 2003, but claims that she ended earlier because her doctor instructed her to remain home for six weeks. (Defs.' R. 56.1 Stmt. ¶ 71; Pl.'s R. 56.1 Stmt. ¶ 71.) NHCC'S attendance records indicate that plaintiff used a combination of her vacation days, sick days, and

personal days to continue her compensation through her retirement on July 7, 2003. (Defs.' R. 56.1 Stmt. ¶ 72.)

Defendants claim that after plaintiff retired, NHCC assigned the position of Medical Records Director to Petra Freese, a non-African American, who was "the most senior Medical Records Supervisor working within the Hospital after Plaintiff's retirement" and had previously served as Medical Records Director. (Defs.' R. 56.1 Stmt. ¶ 72.) Plaintiff contends, however, that Ms. Freese "was appointed to Plaintiff's position in March 2003, immediately following Defendants' transfer of Plaintiff to the Correctional Center." (Pl.'s R. 56.1 Stmt. ¶ 72.)

*Plaintiff's Subsequent Complaints*

Plaintiff submits that she filed a complaint with NHCC's Diversity Office on July 7, 2003, the day of her retirement. (Defs.' R. 56.1 Stmt. ¶ 74.) In addition, plaintiff filed her charge of discrimination with the New York Division of Human Rights in May 2004. (Defs.' R. 56.1 Stmt. ¶ 76.)

## DISCUSSION

### I.  Applicable Law and Legal Standards

Summary judgment pursuant to Rule 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on

the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non- movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts*," Aslanidis v. U.S. Lines, Inc*., 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the

underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not implausible." *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of N. Y.*, 224 F.3d 149, 157 (2d Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II.    Plaintiff's Title VII Discrimination Claim

### A.    *Legal Standard*

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community*

*Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under McDonnell Douglas and its progeny, a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003). The burden of establishing a *prima facie* case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097,147 L. Ed. 2d 105 (2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [the adverse act]." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted). The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and thus, "[e]vidence that an employer made a poor business judgment . . . generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

Should the employer satisfy its burden, the *McDonnell Douglas* framework and its

presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non." See *Reeves*, 530 U.S. at 143. To rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

Finally, "the standards for proving discrimination under Section 296 of the New York Executive Law are the same as under Title VII." *Lucas v. South Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 146 (E.D.N.Y. 2008) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 479, 102 S. Ct. 1883, 72 L. Ed. 2d 262 (1982); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under New York's Human Rights Law "is governed by the same standards as his federal claim")). "[A]ccordingly, the New York Executive Law inquiry is subsumed within the Title VII analysis." *Id.*

**B.** *Application to Plaintiff's Discrimination Claim*

Consistent with the requirements of *McDonnell Douglas*, this Court will first analyze whether plaintiff has established a *prima facie* case of discrimination. Defendants concede that the plaintiff, an African American, is a member of a protected group, and that she was qualified to perform her job. As a result, this Court need only determine whether the plaintiff suffered an adverse employment action under circumstances that give rise to an inference of discrimination.

*Adverse Employment Action*

The Supreme Court has stated that in order to be actionable under federal discrimination laws, an adverse employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761; 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.") (citation and internal quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Materially adverse employment actions also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or material adverse employment action. *Ellerth*, 524 U.S. at 761 (internal quotations and citations omitted).

The Second Circuit has spoken regarding the types of employment transfers that may constitute adverse action. The law dictates that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Galabya v. N. Y. City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000)). An adverse employment action also may be found where "the plaintiff was transferred from an elite unit to one that was less prestigious or where the transfer effected a radical change in [the] nature of the

plaintiff's work." *Id.* (citations and internal quotation marks omitted). In addition, to be materially adverse, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 207 (citations and internal quotation marks omitted). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

According to plaintiff, her main contention is that she suffered an adverse employment action because defendants transferred her to the Nassau County Correctional Center. (Pl.'s Mem. in Opp'n to Summ. J. at 8.) Plaintiff complains that she suffered from a "lack of purpose" at the Correctional Center because she was no longer in charge of the 82 employees in the Medical Records Department and there were no assignments for her. (*Id.* at 8-9.) In addition, plaintiff alleges that she suffered adverse action because during her time at the Correctional Center she was not given "an identification badge, an office, a desk, and/or chair to sit in." (*Id.* at 9.)

Moreover, plaintiff argues that she suffered an adverse employment action because she was constructively discharged. An employee is constructively discharged when the employer, instead of terminating the employee directly, "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Miller v. Praxair, Inc.,* 408 Fed. App'x 408, 410 (2d Cir. 2010) (citing *Terry v. Ashcroft,* 336 F.3d at 151–52.) The standard for finding constructive discharge is something more than what is required to demonstrate a hostile work environment. *Arroyo v. West LB Admin., Inc.,* 54 F. Supp. 2d 224, 231-32 (S.D.N.Y. 1999) (collecting cases). "[C]onstructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." *Miller*, 408 Fed App'x at 410 (citing *Spence v.*

*Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993)). Courts employ a two-prong analysis to this determination, examining both "the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino v. Bell Atl.,* 385 F.3d 210, 229 (2d Cir.2004). Although the plaintiff is not burdened to prove specific intent, she must at least show that "the employer's actions were deliberate and not merely negligent or ineffective." *Id.* at 230 (internal citation and quotation marks omitted). Further, the standard is objective; courts must resolve whether the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders,* 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). "When such conditions are present, the court will treat the plaintiff's voluntary resignation 'as if the employer had actually discharged the employee' for purposes of establishing a *prima facie* case of discrimination." *Weisbecker v. Sayville Union Free School District*, 890 F. Supp. 2d 215, 235 (E.D.N.Y. 2012) (citing *Lopez v. S.B. Thomas, Inc.* 831 F. 2d 1184, 1188 (2d Cir. 1987).

  For purposes of this discussion, the Court will regard plaintiff's transfer to the Correctional Center, where she had no work to do and suffered from a lack of workspace, as an adverse action. Furthermore, the Court will treat plaintiff's voluntary retirement as a constructive discharge resulting from the conditions at the Correctional Center having been so intolerable that she would have been compelled to resign. *See Halbrook v. Reichhold Chemicals, Inc.*, 735 F. Supp. 121, 126 (S.D.N.Y. 1990) (finding that "there [was] a triable issue of fact as to whether [plaintiff's] responsibilities were sufficiently changed or reduced so as to make her job intolerable" because she was stripped of concrete responsibilities and had nothing meaningful to do with her time).

*Inference of Discrimination*

Even assuming a question of fact exists as to whether plaintiff suffered adverse action, plaintiff cannot establish an inference of discrimination. A Title VII plaintiff may establish the last element of the *prima facie* case in a number of different ways depending on the specific facts of the case. *See Abdu-Brisson v. Delta Air-Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Here, plaintiff claims that discriminatory intent can be inferred because "a Caucasian male, [Spina], was assigned to a comparable 'Administrator' position at the Correctional Center . . . [and] immediately provided with an office, identification badge, a desk and a chair." (Pl.'s Mem. in Opp'n to Summ. J. at 12.)

Under a disparate treatment theory, a plaintiff can raise an inference of discrimination "by showing that the employer subjected [her] to disparate treatment, that is, treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). When considering whether a plaintiff has shown that she was subjected to disparate treatment, the Second Circuit requires that the plaintiff demonstrate that she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself. *Id.* Here, plaintiff cannot establish a disparate treatment claim because she has not provided any evidence that she was similarly situated to Spina. To the contrary, plaintiff concedes that Spina was not similarly situated to her in that he was in charge of all health services at the entire jail. (Pl.'s R. 56.1 Stmt. ¶ 54; Reimers-Fincher Dep. at 98-99.)

Furthermore, plaintiff's admissions regarding NHCC's intent further undercut her claim. For example, she concedes that Bie's failure to issue her an identification badge was due to his inexperience. (Reimers-Fincher Dep. at 144.) She also admitted that Dr. Neal, from whom she received assignments at the Correctional Center, did not treat her differently because of

her race.  (Reimers-Fincher Dep. at 102.)

Finally, plaintiff's efforts to rest her claim on the fact that she was "she was replaced by a less-qualified Caucasian female, Petra Freese," are fruitless.  (Pl.'s Mem. in Opp'n to Summ. J. at 11.)  In cases where an employee is replaced by a member of a non-protected group, that the replacement is of another race "may support an inference of discrimination at the *prima facie* step. . . ."  *Pleener v. New York City Bd. of Educ.*, 311 Fed. App'x 479, 481 (2d Cir. 2009).  Here, although defendants contend that Freese did not replace plaintiff until after plaintiff retired, Reimers-Fincher testified at her deposition that defendants asked Freese to replace plaintiff the day after she had been transferred to the Correctional Center.  (Reimers-Fincher Dep. at 58-59.)  Even if a reasonable fact-finder could find that defendants' attempt to replace plaintiff with a person outside of her protected class satisfies the final element of plaintiff's *prima facie* case, no reasonable trier of fact could legitimately conclude that plaintiff met her ultimate burden as she has not provided any evidence suggesting that defendants' proffered reasons for offering the position to Freese, namely that Freese was at the time the second most senior medical records supervisor within the hospital and had previously served as the Medical Director, were pretextual.  *See Pesok v. Hebrew Union College – Jewish Institute of Religion*, 235 F. Supp. 2d 281,286-87 (S.D.N.Y. 2002) (granting summary judgment where despite plaintiff's replacement by a person outside of his protected class, plaintiff raised no evidence that replacement was motivated by discrimination); *St. Mary's Honor Ctr.*, 509 U.S. at 515 ("[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.") (internal quotation marks omitted).  Based on the above analysis, the Court dismisses plaintiff's Title VII discrimination claim.

### III. Plaintiff's Title VII Retaliation Claim

Section 704(a) of Title VII makes it unlawful to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)). "In order to present a prima facie case of retaliation under Title VII . . ., a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII . . ., [2] that the employer was aware of this activity," and "[3] that the employer took adverse action against the plaintiff." *Kessler v. Westchester Cty. Dep't of Social Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (internal quotation omitted). In addition, the Supreme Court recently clarified the causation standard required by § 704(a) stating, "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," as distinct from "a motivating factor," which had previously been the standard in the Second Circuit. [2] *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 2013 WL 3155234, *16 (June 24, 2013); *Kessler*, 461 F.3d at 206.

Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting

---

[2] Although "New York State Courts have yet to address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, nor has the Second Circuit provided . . . guidance as to this issue," this Court will continue to construe the NYSHRL as requiring the same elements as Title VII. *See Dall v. St. Catherine of Siena Med. Ctr.*, 2013 WL 4432354, at *19, n. 12 (E.D.N.Y. 2013) (finding that "[s]ince the NYSHRL statutory language is the same [as Title VII], and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting NYSHRL, this Court will continue to interpret the standard for retaliation under NYSHRL consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*.")

framework set forth in *McDonnell Douglas*. *See Terry*, 336 F.3d at 141. Once the employee

has established a *prima facie* case, the employer "must proffer a legitimate, non-discriminatory

reason for the adverse action. If it does so, then the burden shifts back to the [employee] to

demonstrate pretext." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94-95 (2d Cir.

2001).

Here, plaintiff claims that she engaged in protected activity when she filed a complaint

with the Office of Diversity in July of 2003. Plaintiff cannot establish that any of the adverse

actions alleged in her brief were causally connected to her complaint because they all occurred

prior to her complaint to the O.D. Furthermore, there is no evidence that her complaint to the

O.D. or subsequent complaint to the NYSDHR in 2004 was a but for cause for any alleged delay

in the handling of her worker's compensation claim. (Pl.'s R. 56.1 Counterstmt. ¶ 39.) As a

result, plaintiff's Title VII retaliation claim must fail.[3]

## IV. The Americans with Disabilities Act

The ADA "prohibits employers from retaliating[4] against employees for requesting

accommodations pursuant to the ADA." *Noon v. International Business Machines*, 2013 WL

6504410, at * 14 (S.D.N.Y Dec. 11, 2013) (citing 42 U.S.C. § 12203; *Lovejoy-Wilson v. NOCO

Motor Fuel, Inc.*, 263 F.3d 208, 222-23 (2d Cir. 2001)). "Claims for retaliation are analyzed

under the same burden-shifting framework established for Title VII cases." *Treglia v. Town of*

---

[3] Plaintiff also alleges that she filed an initial complaint with the O.D. by telephone in March 2003 the week after she learned of her transfer, but before she had arrived at the jail, (Pl.'s R. 56.1 Counterstmt. ¶ 37; Reimers-Fincher Dep. at 138-40), however plaintiff provides no details about this conversation other than that Cliff Johnson, an O.D. employee, told her to come to the office and fill out a form, which she declined to do. Furthermore, there is no evidence that this conversation was causally connected to any of the alleged adverse actions plaintiff suffered while working at the Correctional Center.

[4] Plaintiff has abandoned her ADA discrimination claim.

*Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). "In order to establish a prima facie case of retaliation, [plaintiff] must show that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.*[5]

Plaintiff's claim under the ADA must fail because she has not presented any evidence establishing that she engaged in a protected activity. According to the Second Circuit, protected activity under the ADA includes a request for a "reasonable accommodation," but plaintiff cites no evidence of any such request. *Weixel v. Bd. Of Edu. Of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002). Here, plaintiff contends that she engaged in a protected activity when after fracturing her ankle she "asked for assistance of other employees in order to perform her job duties." (Pl.'s Mem. in Opp'n to Summ. J. at 20.) The only evidence plaintiff cites for this proposition, however, is that she reported her accident to Perrotti's secretary on the day of the incident. (Reimers-Fincher Dep. at 65.) Plaintiff does not provide any facts suggesting that as part of this report she asked for an accommodation. Moreover, although plaintiff states in her R. 56.1 Statement that at the meeting with Perrotti and Bie she "requested an I.D. badge so that she did not have to stand on her ankle for long periods of time," (Pl.'s R. 56.1 Stmt. ¶ 44), plaintiff cites no evidence supporting this statement. In fact, she testified to the contrary stating that "she did not recall telling Defendant Perrotti or Bie anything about her injury during the meeting." (Reimers-Fincher Dep. at 65.) As a result, plaintiff's ADA retaliation claim must fail.

---

[5] Plaintiff does not contest that "New York Executive Law § 296 claims are governed by the same legal standard as the ADA." *Romano v. SLS Residential Inc.*, 246 F.R.D. 432, 440 (S.D.N.Y. 2007) (citing *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 117 n. 1 (2d Cir. 2004). Therefore, the New York Executive Law analysis is subsumed within the ADA analysis.

## V.     Plaintiff's 42 USC § 1981 Claims

42 U.S.C. § 1981 prohibits discrimination "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d. Cir. 2004) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68-69 (2d Cir. 2000)).  The *McDonnell Douglas* analysis applies to both Title VII discrimination claims and claims under § 1981.  *Patterson*, 375 F.3d at 225 ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 . . . and the factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983.").  As a result, because no reasonable trier of fact could find in favor of plaintiff on her Title VII discrimination claim, her discrimination claim under § 1981 must fail as well.

Similarly, retaliation claims under § 1981 are generally analyzed in the same manner as under Title VII.  *Acosta v. City of New York*, No. 11 Civ. 856(KBF), 2012 WL 1506954, at *8 (S.D.N.Y. Apr. 26, 2012) ("Claims of retaliation under [Title VII and § 1981] are generally analyzed in the same way, with the same standards of liability.").  Because this Court has dismissed plaintiff's retaliation claim, her § 1981 retaliation claim is also dismissed.

## VI.   Plaintiff's § 1983 Claims

Plaintiff concedes that her equal protection claim under the Fourteenth Amendment is analyzed "similar[ly] to her employment discrimination claims brought under Title VII."  (Pl.'s Mem. in Opp'n to Summ. J. at 16.)  Here, because plaintiff's Title VII claim is insufficient, it

follows that her Fourteenth Amendment equal protection claim is also without merit.

In addition, to the extent plaintiff's § 1983 claim is predicated on a violation of the Due Process Clause of the Fourteenth Amendment, her claim is dismissed as she has not alleged any evidence that she was deprived of a property or liberty interest. *See Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) ("To state a Section 1983 claim [premised upon a due process violation], a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process.").

Furthermore, although Count IV of the plaintiff's complaint alleges violations of her First Amendment rights of free speech and free association, plaintiff has not presented any evidence relating to these claims nor argued these claims in her brief. Plaintiff's First Amendment claims are therefore dismissed.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment pursuant to Rule 56 is granted in its entirety. Plaintiff's claims under 42 U.S.C. §2000(e) et. Seq. (Title VII), 42 U.S.C. § 12101 (ADA), 42 U.S.C. §1981 and 1983, and New York's Human Rights Law, Executive Law §296 are dismissed.

**SO ORDERED.**

Dated: Central Islip, New York

    January 8, 2013                       _____/s/_____

                                          Denis R. Hurley

                                          United States District Judge